# United States Court of Appeals
## For the First Circuit

No. 16-2186

UNITED STATES OF AMERICA,

Appellee,

v.

EDWIN G. PEREZ-CUBERTIER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Julia Pamela Heit for appellant.
John Patrick Taddei, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom John P. Cronan, Acting Assistant Attorney General, Criminal Division, U.S. Department of Justice, Nina Goodman, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana Bauzá-Almonte, Chief, Appellate Division, Assistant U.S. Attorney, Edward G. Veronda, Assistant U.S. Attorney, and Stuart J. Zander, Assistant U.S. Attorney, were on brief for appellee.

May 7, 2020

**Per Curiam**.  A jury convicted Edwin Perez-Cubertier ("Perez") of four counts of possessing with intent to distribute controlled substances in a protected area and conspiring to do the same.[1]  See 21 U.S.C. §§ 841(a)(1), 846, 860.  He now appeals his conviction, raising two evidentiary issues and a constitutional speedy trial claim.  Because we conclude that the district court did not plainly err with respect to any of Perez's challenges, we affirm.

## I.

On appeal of a jury verdict, we recite the facts, consistent with record support, in the light most favorable to the jury's verdict.  See United States v. Lowe, 145 F.3d 45, 47-48 (1st Cir. 1998).

In June 2010, Perez was indicted for participating in a large drug conspiracy conducted from 2006 to June 2010.  The indictment alleged that Perez conspired with more than seventy others to possess with intent to distribute controlled substances within one thousand feet of a public housing facility and that he

---

[1] Appellant's name is spelled "Perez-Cubertier" on the cover page of his own brief and on the district court docket, although it is spelled "Perez-Couvertier" on his request for appointment of counsel on appeal and on the appellate docket and "Perez-Coubertier" at several points in the body of his brief.  For the purposes of this opinion, we adopt the spelling of appellant's name reflected on the district court's docket.

committed four counts of possessing with intent to distribute controlled substances in the same area.

Within two weeks after the grand jury indicted Perez, a cooperating witness notified Perez that he had been charged in the indictment.[2]  Perez did not contact any law enforcement officers and he did not hear from any law enforcement officers about the charges until he was arrested in New York in 2014.

Before his trial, Perez filed a motion in limine seeking to exclude video evidence of the murders of two co-conspirators, "Shaggy" and "Papito," under Federal Rules of Evidence 404(b) and 403.  The district court denied the motion.

At Perez's trial, in which he was the sole defendant, the government presented evidence that, from 2006 to 2010, members of a drug trafficking organization called "La ONU" controlled drug transactions at the San Martin Public Housing Project ("San Martin") in San Juan, Puerto Rico.  According to government witnesses, Perez served as a La ONU drug-point owner in San Martin beginning in 2006.  Drug-point owners arranged for drugs to be supplied to runners for delivery to drug points where the drugs

_____

[2] Maria Lopez-Calderon, the cooperating witness, testified that she informed Perez of the charge against him sometime between the return of the indictment (on June 10, 2010) and her arrest (on June 14, 2010).  In his reply brief, Perez challenges the veracity of Lopez-Calderon's testimony, but, as described infra note 9, the record does not support such a challenge.

- 3 -

were sold.  Witnesses testified that, as a drug-point owner, Perez attended members-only meetings of La ONU.  A drug ledger seized in 2008 listed Perez by a nickname, "Gamito," and indicated that he had retrieved twenty dollars from one of La ONU's drug points.[3] Video evidence showed Perez speaking with members of the organization, including La ONU leaders Shaggy and Papito, near a drug point in San Martin in October 2008.  One cooperating witness testified that anyone attending the meeting shown in the video would have been a member of La ONU.

Although the government did not charge Perez as an enforcer -- that is, a La ONU member tasked with "possess[ing], carry[ing], brandish[ing], us[ing], and discharg[ing] firearms to protect the leaders and members" of the organization -- it presented evidence showing that Perez carried firearms as a part of his role in the conspiracy.  Witnesses also testified that he was present during shootouts with rival drug organizations and dealers.

Government witnesses testified that, in late 2008, another drug-point owner killed Perez's brother, who had also been involved in La ONU.  Afterward, Perez told a co-conspirator that he "was going to go for a while."  In February 2009, Perez moved

---

[3] Perez testified that the handwriting on the ledger did not say "Gamito," but because we recite the facts in the light most favorable to the jury's verdict, we adopt the description provided by the government witness.  See Lowe, 145 F.3d at 47-48.

to New York, purportedly due to both concerns for his own safety and the medical needs of his son, who suffers from cerebral palsy and Dandy Walker Syndrome.

The government also presented evidence that, in June 2009, a La ONU member murdered Shaggy and Papito at the request of a La ONU leader, "Pitufo," who had learned that Shaggy and Papito were planning to kill him. The government attempted to introduce a video of the murders, but Perez, renewing his pretrial motion in limine, objected to the admission of the video but not the testimony about the murders. The district court reversed its earlier ruling, prohibiting presentation of the video but allowing testimony regarding the murders.

Perez testified in his defense that he never participated in La ONU, let alone served as a drug-point owner. He admitted, however, that he had previously participated in a drug conspiracy in the years 2000 to 2001; his daughter and brother lived in San Martin during the relevant period; he knew about the drug conspiracy run by La ONU; his nickname was Gamito; and he was close friends with Shaggy and Papito, whom he knew to be leaders in La ONU.

The jury returned a guilty verdict as to all five counts and Perez timely appealed. He now argues that, because he withdrew from the conspiracy at the end of 2008, the district court should have excluded evidence of the conspiracy's activities occurring

afterward or, alternatively, instructed the jury to ignore such evidence. Further, he contends that the district court improperly admitted evidence of the murders as well as other evidence of La ONU members' violent acts, as such evidence was barred by Federal Rules of Evidence 404(b) and 403. Finally, he asserts that the four-and-a-half-year delay between his June 2010 indictment and December 2014 arrest violated his Sixth Amendment right to a speedy trial.

## II.

We first address Perez's claim that the district court should have excluded evidence of the conspiracy's activities after 2008 or instructed the jury to ignore such evidence. In essence, Perez asserts that, because he withdrew from the conspiracy "at least by the end of 2008," the post-2008 evidence was irrelevant as to the charges against him or, at least, "highly prejudicial."[4] Because Perez neither objected to the admission of the post-2008 evidence based on withdrawal, nor requested a limiting instruction,[5] our review is for plain error. See Fed. R. Evid.

---

[4] Perez does not identify a specific evidentiary rule in arguing that the post-2008 evidence was inadmissible or should have been accompanied by limiting instructions. Without deciding whether this omission waives the argument, we assume that Perez's claim concerns the requirements of Federal Rules of Evidence 402 and 403, which provide for the exclusion of evidence when it is irrelevant or its probative value is "substantially outweighed" by, inter alia, the danger of unfair prejudice.

[5] Perez invokes the notion of withdrawal solely to support

103(e); United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001). To establish plain error, Perez "must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Williams, 717 F.3d 35, 42 (1st Cir. 2013) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

Perez has not met this standard. We may find plain error only if the record so clearly showed Perez's withdrawal from the conspiracy by 2008 that it was obvious error for the district court to allow the jury to consider, without limitation, evidence of the conspiracy's post-2008 criminal activity. In support of his argument, Perez notes that the government offered no direct evidence that he engaged in the conspiracy after 2008, and, indeed, he left for New York in early 2009.

But "[m]ere cessation of activity in furtherance of [a] conspiracy does not constitute withdrawal." United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012) (first alteration in

_____

his evidentiary argument that the district court should have excluded the post-2008 evidence or instructed the jury to disregard it. He did not argue in the district court, and does not argue on appeal, that the evidence presented at trial was insufficient to support findings of guilt on the charges against him because he had withdrawn from the conspiracy. We therefore address his argument solely as an evidentiary matter.

original) (quoting United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam)). To prove withdrawal, the defendant ordinarily must present "evidence that [he] confessed his involvement in the conspiracy to the government or announced his withdrawal to his coconspirators." United States v. George, 761 F.3d 42, 55 (1st Cir. 2014). The record here, at best, suggests the "[m]ere cessation" of Perez's active participation in an ongoing conspiracy. Ciresi, 697 F.3d at 27; see also United States v. Munoz, 36 F.3d 1229, 1234 (1st Cir. 1994) (holding that lack of evidence of defendant's activities during last two weeks of conspiracy did not demonstrate withdrawal from conspiracy); George, 761 F.3d at 55-56 (concluding that admission of co-conspirator's statement was not clear error because defendant's cessation of activity on behalf of conspiracy "constitute[d] inaction rather than affirmative steps to distance himself from his prior involvement" (quoting United States v. Guevara, 706 F.3d 38, 46 n.9 (1st Cir. 2013))).

Even if Perez's relocation to New York removed him from day-to-day collaboration with others involved in the conspiracy, there is no evidence that he communicated "to his co-conspirators that he ha[d] abandoned the [conspiracy] and its goals," Juodakis, 834 F.2d at 1102. In fact, Perez himself notes that some of his co-conspirators understood that his safety concerns, rather than a repudiation of the conspiracy, motivated the move.

- 8 -

In sum, given the absence of evidence showing that Perez had accomplished a withdrawal from the conspiracy, the district court's decision to admit the post-2008 evidence, and later not instruct the jury to ignore it, was not plain error.

**III.**

Perez next contends that the district court improperly admitted evidence of his co-conspirators' violent acts, which he claims was inadmissible under Rules 404(b) and 403. According to Perez, the district court should have excluded the testimony related to Shaggy and Papito's murders as well as a co-conspirator's statement that, to join La ONU, potential members were required to kill someone.[6]

---

[6] Perez also purports to challenge the admission of "[o]ther prejudicial testimony" related to "enemy competitors coming into the projects that would be fired at or beaten up; that [two co-conspirators] gave orders to have their competitors killed; [and that] members of the organization would ride in cars and have shootouts with people who were their enemies when there were battles over the drug points," but he fails to discuss his objections to this evidence with any particularity. Perez's cursory discussion of this evidence, coupled with his failure to identify relevant portions of the trial transcript, "'hamstrings' our ability to review the issues intelligently." González-Ríos v. Hewlett Packard PR Co., 749 F.3d 15, 20 (1st Cir. 2014) (alteration omitted) (quoting Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 15 (1st Cir. 1996)). We therefore do not reach Perez's challenge to the admission of the "[o]ther prejudicial testimony" his brief references. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Perez forfeited his objection to the admission of the murder-related testimony and waived his objection to the admission of the co-conspirator's statement. As for the murders of Shaggy and Papito, the record reveals that although Perez's counsel renewed her objection to the video of the murders, she did not object to testimony about the murders. Indeed, in excluding the video, the district court stated, "I don't think [the government] need[s] the video . . . . [The witness] can testify--," at which point Perez's counsel interjected, "[t]hat they were killed and whatever on whatever date." As for the testimony about having to kill someone to join La ONU, not only did Perez's counsel fail to object to the abbreviated testimony on direct examination, but she also re-elicited the testimony during her cross-examination, thus waiving any challenge to its admission.[7] See United States v. Reda, 787 F.3d 625, 630 (1st Cir. 2015) ("In this circuit,

---

[7] If Perez's counsel had elicited the testimony on cross-examination to undermine its veracity, we might have a different view about the waiver issue. Indeed, where unfavorable testimony is first elicited on direct examination, frequently that testimony will need to be brought up again on cross-examination to recast it in a more favorable light. However, that was not the case here. The mention of the requirement to kill someone on direct was cut off by the prosecutor, and the cross-examination testimony called greater attention to it. Specifically, when the prosecutor asked what aspiring drug-point owners had to do, Lopez-Calderon answered, "[D]ifferent things. If they had to have somebody killed--." The prosecutor did not explore the issue further, but Perez's counsel asked Lopez-Calderon on cross-examination whether one of the jobs a person would have to do to become a drug-point owner "would be to have somebody killed." Lopez-Calderon responded, "[o]n occasions, yes."

'ordinarily, a party who elicits evidence would waive any claim that its admission was error.'" (alteration omitted) (quoting United States v. Harris, 660 F.3d 47, 52 (1st Cir. 2011)). We accordingly limit our inquiry to whether the district court plainly erred in admitting the murder-related testimony. See United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005).

The district court did not plainly err in admitting the murder-related testimony because neither Rule 404(b) nor Rule 403 indisputably barred such evidence. Rule 404(b) prohibits the admission of evidence of "crime[s], wrong[s], or other act[s]" offered to prove a person's character. Fed. R. Evid. 404(b)(1). But the rule applies only "to evidence of other bad acts or crimes," not to evidence of the crime charged. United States v. Arboleda, 929 F.2d 858, 866 (1st Cir. 1991). Thus, in another drug conspiracy case, we upheld against a preserved challenge the admission of evidence of an uncharged murder committed by a co-conspirator. See United States v. Ofray-Campos, 534 F.3d 1, 35 (1st Cir. 2008). There, we explained that, because the indictment charged the co-conspirator as "an enforcer" or "hit man" for the conspiracy, the evidence of the murder provided "direct proof of the means used to carry out the conspiracy," rather than proof of a distinct bad act falling within the ambit of Rule 404(b). Id. Other circuits have likewise upheld against preserved challenges the admission of evidence of violent conduct as direct proof of a

- 11 -

drug conspiracy.  See, e.g., United States v. McGill, 815 F.3d 846, 881-82 (D.C. Cir. 2016) (upholding the admission of evidence of uncharged assaults and attempted murder as direct proof of a narcotics distribution conspiracy, as the charged conspiracy's "broad scope" encompassed violent acts undertaken to, among other things, "enforc[e] internal discipline").

There is, at best for Perez, "a reasonable dispute" as to whether the testimony about Shaggy and Papito's murders was direct evidence of the charged conspiracy, and that "devastates his position" on plain error review.  See United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014).  Here, as in Ofray-Campos, the charged conspiracy's goal was drug distribution, but the alleged means by which members pursued that goal were violent.  According to the indictment, La ONU members "use[d] force, violence, and intimidation in order to . . . discipline members of their own drug trafficking organization."  In particular, leaders authorized disciplinary action and other members carried out those orders. Pitufo was a leader of La ONU at the time that he ordered the murders of Shaggy and Papito.[8]  As such, testimony about Pitufo's order and its execution could reasonably be viewed as offering

---

[8] The indictment refers to two individuals nicknamed "Pitufo," one labeled as a leader and the other as an enforcer.  Although neither party makes clear which Pitufo killed Shaggy and Papito, Perez's briefing indicates that the Pitufo who ordered the murders was a leader at the time he ordered the murders.

"direct proof of the means used to carry out the conspiracy" and illustrating the conspiracy's internal systems of discipline. See Ofray-Campos, 534 F.3d at 35; see also McGill, 815 F.3d at 881-82. Rule 404(b) thus did not indisputably apply to, let alone bar, the testimony about Shaggy and Papito's murders, so the district court did not plainly err with respect to Rule 404(b) in admitting the testimony.

Nor did the admission of the murder-related testimony constitute plain error under Rule 403, which permits courts to exclude relevant evidence if its probative value is substantially outweighed by, among other things, a danger of unfair prejudice. See Fed. R. Evid. 403. Regardless of the standard of review, we review a district court's Rule 403 ruling "from the vista of a cold appellate record" and thus reverse such rulings "only rarely and in extraordinarily compelling circumstances." United States v. Vázquez-Larrauri, 778 F.3d 276, 288 (1st Cir. 2015) (alteration omitted) (quoting United States v. Vizcarrondo-Casanova, 763 F.3d 89, 94 (1st Cir. 2014)); see also United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("When all is said and done, the district court must be ceded considerable latitude in steadying the balance which Rule 403 demands.").

No such circumstances are present here. Concerns about unfair prejudice arise when evidence "invites the jury to render a verdict on an improper emotional basis" or when the evidence is

so "shocking or heinous" that it is "likely to inflame the jury." See United States v. Laureano-Pérez, 797 F.3d 45, 63 (1st Cir. 2015) (quoting United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000)).  The testimony challenged here does not approach this standard: the government aptly characterizes the testimony as lacking "any detail" regarding the murders.  Indeed, Perez neither contests this portrayal nor cites to the relevant portion of the transcript.  See United States v. Rivera Calderón, 578 F.3d 78, 98 (1st Cir. 2009) (finding no error in admission of testimony describing uncharged murders "matter-of-factly, . . . leaving out graphic details" in a drug conspiracy trial); Vázquez-Larrauri, 778 F.3d at 288-89 (holding that district court did not plainly err or abuse its discretion in admitting testimony that was not "overly graphic" about an uncharged murder in a drug conspiracy case).  The district court thus did not plainly err under either Rule 404(b) or Rule 403 in admitting the testimony.

## IV.

Last, Perez insists that the government violated his Sixth Amendment right to a speedy trial by arresting him five years after the grand jury indicted him.  The parties agree that Perez did not preserve this argument and that this court therefore reviews his claim for plain error.  We accordingly assume without deciding that our review is for plain error.  See, e.g., United States v. Mosteller, 741 F.3d 503, 508 n.6 (4th Cir. 2014)

- 14 -

(reviewing constitutional speedy-trial arguments raised for the first time on appeal for plain error).

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial."  U.S. Const. amend. VI.  In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme Court established a four-part balancing test to determine whether a defendant's constitutional speedy trial right has been abridged, requiring assessment of (1) whether delay before trial was unusually long; (2) whether the government or the defendant is more to blame for that delay; (3) whether the defendant timely asserted his right to a speedy trial; and (4) whether he suffered prejudice as a result of the delay.  See Doggett v. United States, 505 U.S. 647, 651 (1992) (citing Barker, 407 U.S. at 530).  "These factors cannot be plugged into a formula that operates with scientific precision[,]" and instead "must be considered on a case-by-case basis 'together with such other circumstances as may be relevant.'"  United States v. Mala, 7 F.3d 1058, 1061 (1st Cir. 1993) (quoting Barker, 407 U.S. at 533).

The district court did not plainly err in permitting the government's case to proceed despite the four-and-a-half-year delay between Perez's indictment and arrest.  The parties agree that the first factor -- the length of the delay -- favors Perez.  See, e.g., United States v. Handa, 892 F.3d 95, 101-02 (1st Cir. 2018) (noting that "[w]hile 'there is no bright-line time limit'"

- 15 -

applied in assessing speedy trial violations, "a 'delay of around one year is considered presumptively prejudicial'" (alterations omitted) (quoting United States v. Irizarry-Colón, 848 F.3d 61, 68 (1st Cir. 2017)).

We assume, favorably to Perez, that the second factor -- the reason for the delay -- weighs slightly against the government. Whereas deliberate delays designed to hamper a defense constitute weighty evidence in favor of the defendant, prosecutorial negligence carries less weight in the speedy trial analysis. See United States v. Johnson, 579 F.2d 122, 123 (1st Cir. 1978); cf. Doggett, 505 U.S. at 652-53 (weighing against the government its failure to make any serious efforts to locate defendant for six years, even if its "lethargy may have reflected no more than [the defendant's] relative unimportance in the world of drug trafficking"). Perez has presented no proof of deliberateness in the government's conduct and the government has offered no explanation for the period of inactivity between the indictment and Perez's arrest. We decline to decide which party bears the burden of persuasion on plain error review and similarly refrain from resolving whether silence coupled with a four-and-a-half-year delay establishes official negligence under the plain error standard. Cf. Barker, 407 U.S. at 531 (in addressing speedy trial claim de novo, focusing on "the reason the government assigns to justify the delay"). Compare United States v. Mensah-Yawson,

489 F. App'x 606, 610-11 (3d Cir. 2012) (placing burden of persuasion for second factor on government on plain error review), with United States v. Williams, 683 F. App'x 376, 384 (6th Cir. 2017) (determining, on plain error review, that second factor favored neither party where "the record before [the court] [was] silent as to the reasons for the actual delay," "largely due to the fact that [the defendant] did not bring a speedy-trial claim at or before trial"). We instead assume, favorably to Perez, that this delay resulted from prosecutorial negligence, leading us to slightly favor Perez on the second factor.

But the third factor -- whether the defendant asserted his speedy trial right -- significantly undermines Perez's claim. His failure to raise his Sixth Amendment claim at any point before this appeal is "entitled to strong evidentiary weight" in determining whether he has been deprived of his constitutional rights. Barker, 407 U.S. at 531-32. Although a defendant "has no duty to bring himself to trial" and does not waive his Sixth Amendment claim by not raising it in district court, he does have some responsibility to assert his speedy trial claim. See Look v. Amaral, 725 F.2d 4, 6-7 (1st Cir. 1984) (noting that, absent an inquiry by the defendant into "the status of the action against him," the "circumstances strongly suggest . . . that [the defendant] gambled with his right, hoping . . . that either his case would be overlooked or that, unreminded, the [government's]

- 17 -

delay would ripen into a period that would improve his chances for acquittal on [S]ixth [A]mendment grounds").  Here, testimony adduced at trial indicates that Perez was aware of the charges against him as early as mid-2010,[9] yet he apparently made no inquiry over the following years.  As such, the third factor counsels against finding that he was deprived of his speedy trial rights.

The fourth factor -- prejudice to the defendant -- similarly weighs against Perez.  "The prejudice prong seeks to protect three interests: avoidance of oppressive pretrial incarceration, minimizing anxiety and concern, and limiting the possibility that the defense will be impaired."  United States v. Carpenter, 781 F.3d 599, 614 (1st Cir. 2015).  "As a general rule, the defendant bears the burden of alleging and proving specific ways in which the delay attributable to the [government] unfairly compromised his ability to defend himself"; however, such

_____

[9] As noted supra note 2, Perez challenges the veracity of this testimony in his reply brief, arguing that "[a] reading of Perez'[s] entire testimony reasonably establishes that he had no [] knowledge [of the charges]."  This argument stands in direct tension with Perez's assertion that pre-arrest knowledge of the charges caused him anxiety that is cognizable under Barker's prejudice prong.  Moreover, we disagree with Perez's characterization of the record.  Perez never testified about the alleged conversation in which Lopez-Calderon informed him of the charges, and although he did testify that he lived his life openly in New York and was not hiding between the time of his indictment and arrest, that testimony in no way suggests that he was unaware of the charges against him.  Thus, Lopez-Calderon's testimony that she informed Perez of the charges against him shortly after the indictment stands uncontested.

- 18 -

prejudice may sometimes be presumed "[i]n aggravated cases, involving grossly excessive delay." Rashad v. Walsh, 300 F.3d 27, 34 (1st Cir. 2002).

Here, the only prejudice Perez has alleged is anxiety and fear concerning his arrest and the prospect that his arrest "would upend his life and that of his family."[10]  "A defendant must struggle to satisfy the prejudice prong after conviction, when two of the three factors relevant to the prejudice analysis -- excessive pre-trial incarceration and impairment of an effective defense -- are of little or no relevance." Carpenter, 781 F.3d at 614.  Moreover, assertions of apprehension or agitation resulting from pre-trial knowledge of the pending charges are not enough; rather, the anxiety must become "undue pressure[]" more severe than the stress that "normally attends the initiation and pendency

---

[10] Perez claims that "witnesses could have easily become unavailable to him, memories could have been impaired due to the passage of time or evidence can become unavailable."  But, because we do not presume prejudice on plain error review of a Sixth Amendment claim, we conclude that such hypothetical damage to Perez's defense does not suffice. Cf. United States v. Olano, 507 U.S. 725, 739-41 (1993) (finding that defendants failed to meet their burden to show prejudice under the plain error test where they made "no specific showing" of harm).  The outcome of the speedy trial analysis is likewise unchanged by two arguments that Perez raises for the first time in his reply brief: that his young, disabled son will be harmed by Perez's imprisonment and that he might have been able to secure a plea deal if arrested promptly. Because these arguments made their debut in his reply brief, we deem them waived. See Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("[W]e do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

of criminal charges." United States v. Henson, 945 F.2d 430, 438 (1st Cir. 1991). While we do not doubt that Perez's fears were acute, he fails to offer any way in which they constituted an "undue pressure" or were more severe than the fears that are endemic to criminal prosecutions. See Carpenter, 781 F.3d at 615 ("While [appellant] argues convincingly that he has suffered great stress throughout the proceedings, he does not demonstrate why his anxiety was greater than that suffered by many other defendants, other than that it continued longer."). As such, the final factor of the speedy trial balancing test militates against reversal.

Taken together, the four Barker factors do not indisputably establish that the government violated Perez's Sixth Amendment speedy trial right.[11] See United States v. Rice, 746 F.3d 1074, 1081-82 (D.C. Cir. 2014) (holding that failure to dismiss indictment was not plain error where only some of the Barker factors favored defendant). The district court's failure to dismiss the indictment thus did not constitute plain error.[12]

---

[11] Perez invites us, in the alternative, to remand his case to the district court so that the factors discussed above "can fairly be explored." "[N]o decision cited to us" -- indeed, Perez cites none in the one sentence he dedicates to his request in his opening brief -- "and none of which we are aware, establishes a basis" for such an order. See Cheshire Med. Ctr. v. W.R. Grace & Co., 49 F.3d 26, 31 (1st Cir. 1995). We therefore decline his request.

[12] Both with respect to his speedy trial claim and at various points in his evidentiary objections, Perez argues that his trial counsel's failure to raise those issues demonstrates that he

See <u>Jones</u>, 748 F.3d at 70 ("[A]n error open to reasonable dispute is not plain error.").

**V.**

For the foregoing reasons, we affirm Perez's conviction and sentence.  <u>So ordered.</u>

--------

received constitutionally ineffective assistance of counsel.  His contentions regarding his attorney's deficiencies are far from clear, however.  Even if Perez articulated his argument more clearly, we would find no reason to review his claim here.  As we recently reiterated:

> "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court."  In adopting this prudential praxis, we have reasoned that "such claims typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal."  .  .  .  Unless "the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration" of a claim of ineffective assistance, a criminal defendant who wishes to pursue such a claim must do so in a collateral proceeding.

United States v. <u>Santana-Dones</u>, 920 F.3d 70, 82 (1st Cir. 2019) (internal citations omitted) (first quoting <u>United States</u> v. <u>Mala</u>, 7 F.3d 1058, 1063 (1st Cir. 1993); then quoting <u>United States</u> v. <u>Natanel</u>, 938 F.2d 302, 309 (1st Cir. 1991)).  The limited development of this issue in Perez's brief, and his failure to point to specific portions of the record that support his ineffective assistance of counsel claim, result in inadequate detail to evaluate why his trial counsel made or did not make certain decisions.